UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MICHAEL FRANKSTON,      )
        Plaintiff     )     CIVIL ACTION
                   )     NO. 05-10495-REK
v.                  )
                   )
BRACKETT B. DENNISTON, III,  )
And DENNIS M. PERLUSS,    )
        Defendants   )

<u>MEMORANDUM OF LAW IN SUPPORT OF MOTION OF DEFENDANT PERLUSS TO
DISMISS FOR FAILURE TO STATE A CLAIM</u>

BACKGROUND

This is a legal malpractice action[1] brought against defendants Brackett B. Denniston, III

("Denniston") and Dennis M. Perluss ("Perluss").

This suit arises out of a claim by Frankston that the defendants Denniston and Perluss

negligently handled prior litigation relating to a business venture in which Frankston had

invested.  In connection with the underlying litigation, the plaintiff initially retained Denniston in

January, 1989 to investigate and initiate a civil action on his behalf.  (Paras. 13-21)  The suit was

commenced in Massachusetts in March 1991.  (Para. 21)  <u>See also,</u> <u>Frankston v. Aura Systems,</u>

<u>et al.</u>, U.S.D.C. (Mass.) Docket No. 1:91-cv-10806 AAC.  Attachment "A".   After the suit was

transferred to the federal court in California in October 1991, <u>see id</u>. at docket entry no. 12,  the

defendant Perluss was retained to act as local counsel.  (Para. 22)  In early 1993, the plaintiff

became dissatisfied with defendant Perluss and replaced him with Attorney Tropper[2].  (Para. 25)

In September 1993, the federal district court allowed the Defendants' Motion for Summary

Judgment, holding that the "action was untimely under California's statute of limitations".  (Para.

---

[1] The action was removed to this Court from the Massachusetts Superior Court pursuant to Notice of Removal filed
by defendant Denniston on March 15, 2005, which was consented to by defendant Perluss.
[2] Attorney Tropper represented Frankston in the California federal court and state court actions, and is now counsel
of record in this action.  The co-defendant Denniston remained as counsel of record in the federal court action for
some period of time after Perluss was discharged.

28 )  In June 1994, while an appeal of the summary judgment finding was pending in the Ninth Circuit Court of Appeals, Frankston, represented by Attorney Tropper, filed a separate state court action in California, asserting additional claims arising out of the same set of business dealings. (Para. 29)  Eventually the Ninth Circuit Court of Appeals reversed the district court' summary judgment finding and remanded the case to the district  court for trial.  That trial resulted in a finding for the plaintiff.  In the state court action the plaintiff survived a summary judgment motion, by arguing that he "did not learn of the potential for a  claim against the individual partners until late 1992", and went on to achieve a substantial verdict.  (Para. 31, 32 33)  On appeal the California  Court of Appeal held that the claims were time barred, specifically holding that the plaintiff was on notice of his potential claims at least by 1989.  (Para. 35)  The California Supreme Court declined further review.  (Para 37)

The plaintiff now claims that Denniston and Perluss were negligent in the handling of the underlying litigation in two broad areas:  (1) Denniston gave improper advice regarding the "illegality" of certain "stock pooling" claims, and was negligent in declining to assert them in the federal court action, yet these same claims ultimately formed the basis of the California state court action and were the basis for a substantial recovery which was then lost due to untimely filing.  The plaintiff alleges that same set of facts warranted separate claims against his former co-investors and against the corporation with which the proceeds of the stock scheme had been invested.  The plaintiff claims that Perluss should have independently investigated these claims when he became local counsel and caused the claims to have been asserted in the federal court action.  And (2) as a derivative of the first claim, Frankston claims that Denniston failed to advise him as to the limitations period for the filing of any claim for the value of the shares, and that after the action was transferred to California, Perluss also failed to advise Frankston as to the running of a limitations period on that claim.

Specifically in connection with defendant Perluss, the plaintiff asserts the following allegations of professional malpractice:

(1)  failed to investigate reasonably in a timely manner the underlying factual basis for Mr. Frankston's claims;

(2)  failed to research reasonably the viability of all of the potential claims available to Mr. Frankston;

(3)  failed to file Mr. Frankston's claims against the individual partners relating to their taking of his Partnership Debt Shares and cash share of partnership distribution before the statute of limitations expired; and

(4)  failed to advise or warn Frankston that the statute of limitation applicable to his claim relating to the stock pool would lapse no later than 1993.[3]

(Para. 45)

This memorandum will demonstrate that under the laws of both Massachusetts and California[4] Frankston's claim against Perluss fails as a matter of law where Frankston specifically pleads that Perluss was terminated from Frankston's representation in 1993, this lawsuit was not filed until 2004, and where Frankston has specifically alleged facts which put him on sufficient notice of both Perluss's alleged negligence and the harm that purportedly flowed from it for purposes of the running of the statute of limitations many years before the limitations periods contemplated under both Massachusetts and California law for malpractice claims.

<u>DISPOSITIVE ALLEGATIONS</u>

---

[3] Query, if plaintiff is truly advancing the theory that he should have been advised by 1993 regarding the statute of limitation would his current counsel be a necessary party, or at a minimum a necessary witness, since current counsel represented plaintiff as of 1993 and filed the California state court action in 1994.

[4] Since the substantive rules of law applicable to legal malpractice cases entailing the circumstances here are similar in California and Massachusetts and lead to the same result, the choice of law analysis sometimes required in diversity cases under *Klaxon v. Stentor Electric Mfg. Co.*, 313 U.S. 487 (1941), is not required of the court here. *Lambert v. Kysar*, 983 F.2d 1110, 1114 (1st Cir. 1993).

The complaint (and/or the judicial rulings referred to in the plaintiff's amended complaint)[5] alleges and/or conclusively establishes for purposes of this motion the following:

1.      Perluss was hired to serve as local counsel after the federal action was transferred from Massachusetts to California. (Amended Complaint, para. 22)

2.      By the end of 1992 Frankston was dissatisfied with Perluss' handling of the federal action. (para. 25)

3.      Frankston fired Perluss and engaged the law firm and Lee & Tropper[6] to replace Perluss' firm in early 1993.  (para. 25)

4.      In September, 1993, the federal district court dismissed the federal action on statute of limitations grounds. (para. 28)

5.      "Frankston was concerned in 1993 that his still-unasserted claims relating to the stock pool could be untimely if he waited for the outcome of his appeal in the [federal action]." (para. 29).   Frankston therefore filed [the state court action] in June, 1994."   (para. 29) Frankston's successor counsel, Tropper, elected to file a separate action in state court and to continue to prosecute the claim for the 40,000 shares in state court, rather than seek to join that claim with the federal action so as to have the claim for the 40,000 shares relate back and thereby avoid the statute of limitations problem.  (See para. 29)

6.      With respect to the state court action Tropper undertook at least four specific legal services subsequent to the discharge of Perluss, independent of any conduct of Perluss, with regard to pursuit of the claim for the value of the 40,000 shares:   (1) "independent investigation

---

[5] Since Frankston has specifically based his allegations upon the California federal and state court actions, the courts' records from those respective actions are properly considered by this Court on a motion to dismiss and are judicially noticeable. 2 *Moore's Federal Practice,* § 12.34 (Matthew Bender 3d ed.)*; see also Allen v. Westpoint-Pepperell, Inc.*, 945 F.2d 40, 44 (2d. Cir. 1991) (appended documents and matters of judicial notice may be considered in ruling on motion to dismiss); *Southern Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Group, Ltd.*, 181 F.3d 410, 426-427 (3d. Cir. 1999) (court may take judicial notice of public records, including judicial proceedings); *5-Star Management Inc. v. Rogers*, 940 F. Supp. 512 (E.D.N.Y. 1996).   The decision of the Court of Appeal from the state court action is Attachment B.
[6] Attorney Tropper filed this malpractice action on Frankston's behalf.

into the factual and legal basis of [the claim for the value of the shares]" (Para. 27; see also Para. 45), (2) "research [as to] the viability of [that claim]") (Para. 45), (3) "fil[ing] a separate claim [for the value of those shares]" (Para. 29; see also Para. 45), and (4) advice as to the applicability of the statute of limitations to that claim (Paras. 27-29; 45).

7.    In the Summer of 1995, the defendant partners in the California state action moved for summary judgment on statute of limitations grounds, contending that Frankston knew or should have known at the latest by the beginning of 1989 that he had potential claims against the individual partners.  (para. 30)

8.    In opposing the defendants' statute of limitations motion, Frankston argued that he learned about the potential for a claim against the individual partners for the value of the allegedly stolen shares in late 1992. (para. 31)

9.    Frankston succeeded in obtaining a verdict against his partners at trial in the state court action, but on appeal "the Court of Appeal in California reversed the judgment based on its agreement with Appellants that the relevant statutes of limitations had run before the suit was brought.  Specifically, the Court held that the acts which gave rise to Frankston's cause of action (the wrongful dividing of Frankston's assets among themselves) occurred in the Fall of 1988 and that the evidence was 'susceptible to only one legitimate inference showing Frankston had constructive notice of the claims not later  (than) the Spring of 1989.'" (para. 35)

## ARGUMENT[7]

---

[7] A Motion to Dismiss is appropriate when the facts set forth in the complaint establish that the alleged occurrence was beyond the statute of limitations.  See LaChapelle v. Berkshire Life Insurance Co., 142 F.3d 507, 509 (1st Cir. 1998) (granting motion to dismiss pursuant to Fed.R.Civ.P. 12(b) based on statute of limitations grounds where "pleader's allegations leave no doubt that an asserted claim is time barred.")  See also Street v. Vose, 936 F.2d 38, 39 (1st Cir. 1991) (affirming district court's decision to dismiss plaintiff's complaint sua sponte where allegations only state "a claim that appears to have expired under the applicable statute of limitations").

THE PLAINTIFF'S CLAIMS ARE BARRED UNDER BOTH THE MASSACHUSETTS
AND CALIFORNIA STATUTES OF LIMITATIONS

A.    <u>Under Massachusetts law, the limitations period on this malpractice action against
Perluss ran by no later than 1997, if not many years before, by reason of Frankston's
termination of Perluss in 1993, his retention of Tropper, and his admitted notice of his
claim.</u>

Actions for malpractice against attorneys are subject to a three-year statute of limitations

in Massachusetts.  G.L. c. 260, §4.  A plaintiff has the burden of proving facts taking his case

outside the statute of limitations when he has failed to bring a suit within that period.  *Friedman*

*v. Jablonski,* 371 Mass. 482, 487 (1976); *Franklin v. Albert,* 381 Mass. 611, 619 (1980).  While

Massachusetts applies a discovery rule in malpractice cases, a plaintiff seeking to avoid the

statute of limitations bar by invocation of the discovery rule may not do so by simply sitting idly

as time goes by and ultimately pursuing a claim.   Rather, under Massachusetts law, the

limitations period [for a legal malpractice claim] begins to run "once a client or former client

knows or reasonably should know that he or she has sustained appreciable harm as a result of the

lawyer's conduct…."  *Williams v. Ely*, 423 Mass. 467, 473, 668 N.E.2d 799 (Mass. 1996).  "[A]

plaintiff [must] have (1) knowledge or sufficient notice that she was harmed, and (2) knowledge

or sufficient notice of what the cause of the harm was."  *Bowen v. Ely Lilly Co.*, 408 Mass. 204,

208, 557 N.E.2d 739 (Mass. 1990) (cited with approval in *Williams*, 423 Mass. at 473).  The test

for when the cause of action accrues in legal malpractice cases is objective, not subjective.  See

*Hendrickson,* 365 Mass. at 89-90; *Friedman,* 371 Mass. at 486 (once plaintiff "*could* reasonably

have known" of the cause of action, statute runs "as a matter of law") (emphasis supplied).  "For

purposes of accrual of a legal malpractice claim, 'harm' occurs when a client expends 'additional

attorneys fees to ameliorate the harm caused by [his original attorney's] error."  *Rosen*

*Construction Ventures, Inc., et. al. v. Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., et. al.,*

364 F. 3d 399, 405 (1st Cir. 2004) quoting *Levin v. Berley*, 728 F. 2d 551, 554 (1st Cir. 1984)

(interpreting Mass. G.L. c. 260 § 4).  See also *Cantu v. St. Paul Cos.*, 401 Mass. 53, 57, 514 N.E.2d 666 (1987); *Massachusetts Elec. Co. v. Fletcher, Tilton & Whipple*, 394 Mass. 265, 268-269, 475 N.E.2d 390 (1985).

(i)  Plaintiff Had Notice of Dissatisfaction and Potential Malpractice At Least By 1994

As a threshold matter, Frankston specifically and repeatedly concedes the "discovery" prong of the "coalescence of discovery and appreciable harm" trigger of the running of the statute under Massachusetts law. *See Cantu,* 401 Mass. at 57. Beyond expressly pleading his dissatisfaction with Perluss by the end of 1992 (Para. 25), he goes on to specifically allege that he was "concerned in 1993" that his "still-unasserted claims . . . could be untimely", and that specifically because of this he filed the California state court action in June, 1994. (Para. 29)  On top of this conceded knowledge, he admits that he argued before the California court that he was aware of the claim for the value of the shares in late 1992 (Para. 31), and further that he was adjudicated to have had specific notice of the claim for the value of the shares no later than the Spring of 1989.  (Para. 35)  Given his explicit assertions as to knowledge of existence of the viability of the underlying claim going back to 1989, and the alleged prejudice to that claim which he asserts he was aware of through the retention and activity of Tropper's firm in pursuing in 1994 the very claim allegedly neglected by Perluss in 1992, Frankston has specifically alleged that he had the requisite notice of malpractice no later than when Tropper filed the California state action in June, 1994, if not well before then.  Thus under Massachusetts' three year statute Frankston had the requisite notice of alleged malpractice no later than 1997, even with the benefit of the discovery rule.

In addition, other allegations in the complaint establish Frankston was on notice of his potential claim well prior to 1994.  For example, in opposing the summary judgment motion in the state court action, Frankston "argued that he did not learn about the potential for a claim

against the individual partners until late 1992" (para. 31).  If this is so, Frankston learned of the potential claim prior to his dissatisfaction with and then discharge of Perluss.  Having asserted in that underlying court action that he was aware of the purported viability of that claim (i.e. he had necessarily rejected the advice from defendant Denniston that it was grounded upon illegal conduct and hence not properly prosecutable), he is judicially estopped from playing "fast and loose" and claiming he was unaware of the nature of his harm and the purported source of it until many years later.  18 JAMES WM. MOORE ET. AL., MOORE'S FEDERAL PRACTICE ¶ 134.30, AT PAGES 134.62.1 – 134.70 (3d ed. 2003); *see also Patriot Cinemas, Inc. v. General Cinemas Corp.*, 834 F.2d 208, 212 (1st Cir. 1987), quoting *Scarano v. Central R. Co.*, 203 F.2d 510 (3d Cir. 1953).

Finally, Frankston specifically alleges that the Court of Appeal in California ruled against him, holding that "the evidence was 'susceptible to only one legitimate inference showing Frankston had constructive notice of his claims not later (than) spring of 1989.'" (para 35) Having litigated this point and lost it, he is collaterally estopped to deny it.  *Willhauck v. Halpin*, 953 F.2d 689, 705 (1st Cir. 1991); *Miles v. Aetna Cas. And Sur. Co.*, 412 Mass. 424, 426-427 (1992).  Where he is estopped to deny being on notice of his underlying claim for the value of the shares in 1989, he is likewise necessarily estopped to deny that any purported negligent failure to advise with regard to the viability of that claim vitiated that notice, and therefore is deemed to have known that his alleged right to the value of the forty thousand shares was omitted from the federal action from the time it was filed, let alone later in 1993 when he admits that he "was concerned" over the lateness of the claim.

(ii) Plaintiff Sustained Appreciable Harm At Least By 1994

As to the other prong of the inquiry, that of appreciable harm, the complaint specifically alleges a number of events, any of which put Frankston on notice of the alleged harm flowing from the claimed malpractice far more than three years before the filing of this action.

Frankston specifically pleads that his harm was appreciable many years ago in his allegations concerning the replacement of Perluss' firm with that of Tropper. Those specific allegations include, *inter alia,* that Tropper's firm undertook legal services and incurred costs specifically necessitated by Perluss' alleged negligence including (1) independent investigation into the legal and factual basis of the claim for the shares, (2) the filing of the separate California state action, (3) research as to the viability of that claim, and (4) advice on the statute of limitations issue. (See Paras. 27-29; 45). Thus, by no later than June, 1994, as a matter of law Frankston's pleading asserts that he sustained tangible economic harm directly resulting from Perluss' alleged negligence not only in the form of filing fees for the California state court action, Cal. Gov't. Code § 26820.4, but also by reason of the more substantial legal obligation to pay for the above-noted variety of legal services afforded by Tropper before June, 1994, whether through an hourly fee agreement, a contingent fee agreement, or in any event on a quantum meruit basis. See *Salem Realty Co. v. Matera,* 384 Mass. 803, 804 (1981); *Craft v. Kane,* 5 Mass. App. Ct. 648, 653 (2002); *Fracasse v. Brent,* 6 Cal. 3d 784, 791, 494 P. 2d 9, 100 Cal. Rptr. 385 (1972).

As observed by the First Circuit, under Massachusetts law:

> For purposes of accrual of a legal malpractice claim, "harm" occurs when a client expends "additional legal fees to ameliorate the harm caused by [his original attorney's] error." *Levin v. Berley,* 728 F. 2d 551, 554 (1st Cir. 1984) (interpreting Mass. G.L. c. 260, § 4). See also *Cantu v. St. Paul Cos.,* 401 Mass. 53, 57, 514 N.E. 2d 666 (1987); *Massachusetts Elec. Co. v. Fletcher, Tilton & Whipple,* 394 Mass. 265, 268-269, 475 N.E. 2d 390 (1985).

*Rosen Construction Ventures, Inc., et al. v. Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., et al.,* 364 F. 3d 399, 404-405 (1st Cir. 2004). Here, Frankston specifically alleges that he retained Tropper to "ameliorate the harm" allegedly caused by Perluss' failure to file the claim for the shares, and that Tropper proceeded with the filing and prosecution of the California state court action. Accordingly, by reason of the incursion of economic harm (filing fees, costs, legal fees, etc.) associated with the state court action, Frankston sustained the requisite "harm" to trigger the running of the statute of limitations no later than June, 1994. Accordingly, by then the "necessary coalescence of discovery and appreciable harm occurred". *Cantu,* 401 Mass. at 57. [8]

Accordingly, Frankston's claim against Perluss is barred under the Massachusetts statute of limitations.

**B.**     Frankston's claim against Perluss is likewise barred under the California statute of limitations.

Under California law, an action against an attorney for malpractice must be commenced within one year after the plaintiff discovers, or through the use of reasonable diligence should have discovered, the facts constituting the malpractice, or four years from the date of the malpractice, whichever occurs first. Code Civ. Proc. § 340.6(a). The one-year limitation period is strictly enforced where applicable, and is not even tolled where an attorney attempts to willfully conceal facts constituting the wrongful act or omission. See Code Civ. Proc. § 340.6(a)(3). The limitations period may be tolled where the plaintiff has not sustained actual injury, Code Civ. Proc. § 340.6(a)(1), or in limited circumstances (not present here) where the attorney continues to represent the plaintiff regarding the specific subject matter in which the alleged wrongful act or omission occurred. Code Civ. Proc. § 340.6(a)(2).

---

[8] That the California state action had not been finally concluded as of June, 1994, but was subject to further appeal "is of no import" where Frankston incurred economic harm associated with the retention of successor counsel to file the same claim he accuses Perluss of not filing. *Cantu,* 401 Mass. at 57-58.

The Supreme Court of California has recognized that this statutory scheme permits a plaintiff who has actual or constructive knowledge of an attorney's error only one year in which to file a malpractice action after sustaining actual injury:

> As a result, a plaintiff who actually or constructively discovered[9] the attorney's error, but who has suffered no damage to support a legal malpractice cause of action, need not file suit prematurely, rather, the plaintiff still has one year *after* sustaining actionable injury to assess whether, and how, to pursue a remedy against the attorney.

*Jordache Enterprises Inc., et al. v. Brobeck, Phleger & Harrison, et al.,* 18 Cal. 4th 739, 958 P. 2d 1062, 76 Cal. Rptr. 2d 749, 762 (1998) (emphasis supplied by the Court). Moreover "the determination of actual injury does not necessarily require some form of adjudication, judgment, or settlement." *Jordache,* 76 Cal. Rptr. 2d at 760. Rather, "[a]*ny appreciable and actionable harm flowing from the attorney's negligent conduct establishes a cause of action upon which the client may sue." Id.* at 757 (emphasis supplied by the Court).

Such appreciable or actionable harm occurs when "[a] client suffers damage when he is compelled, as a result of the attorney's error, to *incur* or pay attorney's fees." *Sirott v. Latts,* 6 Cal. App. 4th 923, 926 (1992) (emphasis supplied), citing *Budd v. Nixen,* 6 Cal. 3d 195, 201-202, 98 Cal. Rptr. 849, 491 P. 2d 433 (1971). Further, the "actual damage need not be defined in terms of monetary amount" *Sirott,* 6 Cal. App. 4th at 929, citing *Laird, supra,* 2 Cal. 4th at 614. "[T]he Legislature used the term 'actual' to focus on the *fact* that damages occurred, and eliminated all qualifiers to prevent confusion that would arise by requiring courts to consider the total amount of damages." *Laird,* 2 Cal. 4th at 613 (emphasis supplied by the court). It is "*the mere accrual of the obligation for attorney's fees* to rectify a mistake by a former attorney [which] constitutes sufficient damage to trigger the statute of limitations." *Bennett v. McCall,* 19

---

[9] As shown on pp. 5-6, *supra*, Frankston's pleading concedes the discovery prong of the statute of limitations inquiry.

Cal. App. 4th 122, 128, 23 Cal. Rptr. 2d 268 (1993), citing *Kovaceivich v. McKinney & Wainwright,* 16 Cal. App. 4th 337, 19 Cal. Rptr. 2d 692 (1993).

For example, *Jordache* involved a situation where the plaintiff's attorneys had failed to timely provide notice to a liability insurer with respect to the defense of an underlying action. Because of late notice, the liability carrier refused to defend, requiring Jordache to assume the expense of the defense of the litigation, and to engage other counsel in an effort to cure the harm caused by the alleged omission. *Id.* at 753-754. Rejecting Jordache's argument that it had not sustained actual injury so as to trigger the running of the statute of limitations so long as the litigation brought by its successor counsel against the insurer was not resolved, the Court held that actual injury already existed in several tangible respects: (1) Jordache was required to pay defense costs in the underlying action because of the alleged neglect of its attorneys, (2) Jordache lost investment opportunities for those funds, (3) the alleged neglect "gave the insurers an objectively viable defense" which they would not have had but for the alleged malpractice, and (4) the settlement value of Jordache's claims in the underlying matter decreased as a result of the alleged malpractice. *Id.* at 759, 765.

In light of the foregoing, it is clear that application of California law, like that of Massachusetts, results in dismissal based on Frankston's specific allegations. Since Frankston expressly alleges not only that Tropper filed the state court action on his behalf in June, 1994, but also that beforehand Tropper (1) performed an independent investigation into the legal and factual basis of the claim for the shares, (2) researched the viability of that claim, and (3) provided advice on the statute of limitations issue (see Paras. 27-29; 45), Frankston sustained actionable harm for purposes of triggering the California statute of limitations because by the rendering of these services by Tropper, Frankston incurred the obligation to pay attorney's fees.

*Jordache,* 76 Cal. Rptr. 2d at 759-765; *Sirott,* 6 Cal. App. 4th at 926; *Bennett,* 19 Cal. App. 4th at 128; and *Fracasse,* 6 Cal. App. 3d at 791.

Accordingly, any claim by Frankston against Perluss was barred one year after the June, 1994 California state court filing, at the latest. *Jordache,* 76 Cal. Rptr. 2d at 762.

Finally, as under Massachusetts law, tolling under § 340.6(a)(2) is not an issue because Perluss did not continue to represent Frankston after the 1993 termination.

<u>CONCLUSION</u>

For the above reasons, Frankston's claim against Perluss is barred under the statute of limitations for legal malpractice actions under both Massachusetts and California law, and accordingly should be dismissed.

Defendant,

Dennis M. Perluss,
By his attorneys,


<u>/s/ Myles W. McDonough</u>_____
Edward T. Hinchey, BBO #235090
Myles W. McDonough, BBO #547211
SLOANE AND WALSH, LLP
Three Center Plaza
Boston, MA  02108
(617) 523-6010

Dated:_____

CERTIFICATE OF SERVICE


I, Myles W. McDonough, counsel for defendant, do hereby certify that on this 15th day of April, 2005, I caused to be served a true copy of the foregoing upon the parties by regular mail, post paid, to their counsel of record:

Joshua Tropper, Esq.
GAMBRELL & STOLZ, LLP
303 Peachtree Road, Suite 4300
Atlanta, GA 30308

John Kenneth Felter, Esq.
William J. Connolly, Esq.
Jeremy C. Millard, Esq.
GOODWIN PROCTOR, LLP
Exchange Place
Boston, MA  02109

_____
Myles W. McDonough

madei Docket Report

United States District Court
District **of** Massachusetts (Boston)
CIVIL DOCKET FOR CASE 14: 1:91-cv-10806-AAC

Frankston v. Aura Systems. ct al
Assigned to: Senior Judge Andrew A. Caffrev
Demand: $0
Cause: 28:1332 I)iversity-Breacb of Contract
Date Filed: 03/13/1991
Jury Demand: Plaintiff
Nature of Suit: 1 90 Contract: Other
Jurisdiction: Diversity
**Plaintiff**
**Michael Frankston**
represented by **Brackett B. Denniston, ITT**
  Goodwin Procter, LI.. P
  Exchange Place
  Boston, MA 02109
  *617-570-1944*
  *LEAD ATTORNEY*
  *ATTORNEY TO BE NOTICED*
**Defendant**

**Aura Systems, Inc.**
represented by
Alan 1). Rose, Sr
Rose & Associates
29 Commonwealth Avenue
Boston, MA 02216
617-536-0040
Fax: 617-536-4400
EmaiF adr¹ârose-law.net
*LEAD ATTORNEY*
*ATTORNEY* **7X**) *BE NOTJCEL)*

Matthew **P. Todd**
1 640 South Sepulveda
Boulevard
Los Angeles, CA 90025-
3512
213-478-8684
*LJZiI I) A T^T TORNEY*
*A TTORNEY TO BE*

*NOTICED*

**Defendant**

**Cypher Master, Inc.**
represented by
**Alan D. Rose, Sr**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Matthew P. Todd**
(See above for address)
*LEA I) A TTORiVEY*
*A '17'ORNE F Y'O BE*
*No YYCED*

**Defendant**

hffps://ecf.mad.uscourts.gov/cgi-bin!DktRpt.pl?7643 6488495 8434-L_280_0-1

Page 1 of4 CLOSED

madei Docket Report

**Innovative Information Systems**
represented by **Alan D. Rose, Sr**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOT/CE!)*

**Matthew P. Todd**
(See above for address)
*LEAD A TTORNEY*
*ATTORNEY TO BE*
*NOTICED*

**Defendant**

**Zvi Kurtzman**
represented by **Alan D. Rose,** Sr
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
**Matthew P. Todd**
(See above for address)
*LEAD A J'TORNE F*
*A TTORNEY TO BE NOTICED*

| Date Filed | ft | Docket Text |
|---|---|---|
| 03/13/1991 | 1 | Complaint filed *(fmr)* (Entered: 03/18/1991) |

03/13/1991        Filing Fee Paid. Receipt #: 08275 Amount: 120.00. (fmr) (Entered: 03/18/1991)

03/13/199 1       Summons(es) issued for Aura Systems, Cypher Master. Inc., Innovative lnforrnat. Zvi KurtLman (fmr) (Entered: 03/1 8/1 991)

05/14/1991    2   Return of service executed as to Zvi Kurtzman by private process server on 5/1/91 Answer due on 5/21/91 for Zvi Kurtzrnan (1mb) (Entered: *05/16/1* 991)

05/14/1991    3   Return of service executed as to Aura Systems by private process server on 4/26/9 1 Answer due on 5/16/91 for Aura Systems (lmh) (Entered: 05/16/1991)

05/14/1991    4   Return of service executed as to Innovative Informat by private process server on 4/26/9 1 Answer due on 5/16/91 for Cypher Master. Inc. (lmh) (Entered: 05/i 6/1991)

05/14/1991    5   Return of service executed as to Innovative Informal by private process server on 4/26/91 Answer due on 5/16/91 for Innovative Inforrnat (1mb) (Entered: 05/16/1991)

06/1 8/1 991  6   Ex Parte Motion by Aura Systems, Cypher Master, Inc., Innovative Informat, Zvi Kurtzman to extend time to answer the complaint to 6/28/91 to Senior Judge Andrew A. Caffrey (1mb) (Entered: *06/25/1* 991)

06/27/1991    7   Motion by Michael Frankston, Aura Systems, Cypher Master, Inc., Innovative Inforrnat, Zvi Kurtzman to extend time to answer to 7/12/91 (1mb) (Entered: 06/27/1991)

07/01/1 991       Senior Judge Andrew A. Caffrev  Endorsed Order granting [7-1] motion to extend time *In* answer to 7/12/91. reset answer due for 7/12/91 for Zvi Kurtzman. for Innovative inforrnat. for Cvphcr Master, Inc., for Aura Systems (1mb) (Entered: (17/03/1991)

07/01/1 991       Senior Judge Andrew A. Caffrey  Endorsed Order denying [6-1] motion to extend time to answer the complaint to 6/28/91 (1mb) (Entered: 07/03/1991)

9 **I** Motion by Aura Systems. Cypher Master, Inc., Innovative Informat, Zvi Kurtzman to dismiss for

improper forum, or, in the alternative, to transfer to another district (1mb) (Entered: 07/i 5/1991)

10 Memorandum by Aura Systems, Cypher Master, Inc., Innovative Informat, Zvi Kurtzman in support of [9-1] motion to dismiss for improper forum, or. in the alternative, to transfer

to another district (lrnh) (Entered: 07/1 5/1991)

Affidavit by 2.,vi Kurtzman Re: [9-li motion to dismiss for improper forum, or, in the alternative, to transfer to another district (lmh) (Entered: 07/15/1991)

12 Affidavit of Matthew P. Todd Re: [9-1] motion to dismiss for improper forum, or, in the alternative, to transfer to another district (1mb) (Entered: 07/15/1991)

9 **I** Motion by Aura Systems, Cypher Master, Inc., Innovative Informat, Zvi Kurtzman to transfer case to Senior Judge Andrew A. Caffrey (1mb) (Entered: 09/18/1991)

Senior Judge Andrew A. Caffrev Endorsed Order granting [8-1] motion for Matthew P. Todd to appear pro hac vice (1mb) (Entered: 07/22/1991)

131 Memorandum by Michael Frankston in opposition to [9-1] motion to dismiss for improper forum, or, in the alternative, to transfer to another district (1mb) (Entered: 07/30/1991)

14 Affidavit of Michael Frankston Re: [13-i] opposition memorandum (huh) (Entered: 07/30/1991)

Motion hearing re: [9-i] motion to dismiss for improper forum, or, in the alternative, to transfer to another district at 10:30 9/18/91 (1mb) (Entered: 07/30/1991)

15 Affidavit by Michael Frankston Re: [13-1] opposition memorandum to motion to dismiss (1mb) (Entered: 08/26/199 1)

16 **I** Motion by Aura Systems. Cypher Master, Inc.. Innovative Informat, Zvi Kurtzman for leave to file Reply to Plaintiffs Opposition to Defendants Motion to I)ismiss for Improper
Forum, Etc. to Senior Judge Andrew A. Caffrey (1mb) (Entered: 09/1 7/1 991)

Senior Judge Andrew A. Caffrey Endorsed Order granting [16-1] motion for leave to file Reply to Plaintiffs Opposition to Defendants Motion to Dismiss for Improper Forum, Etc.
(1mb) (Entered: 09/18/1991)

10 **I** Reply to Plaintiffs Opposition to Defendants Motion to Dismiss for Improper Forum or, in the alternative, to Transfer to another district (1mb) (Entered: 09/18/1991)

Motion hearing re: [9-il] motion to transfer case, [9-i] motion to dismiss for improper
forum, or, in the alternative, to transfer to another district Motion hearing held (1mb)
(Entered: 09/18/1991)

iii Senior Judge Andrew A. Caffrey Clerk's Notes: granting [9-1] motion to transfer case, denying [9-i] motion to dismiss for improper forum, or, in the alternative, to transfer to
another district. Case to be transferred to the Central District of California (1mb) (Entered:

09/1 8/i 991)

12 **I** Senior Judge Andrew A. Caffrey  Order, transferrinu case to the Central District of California (cfs)
(Entered: 10/28/1991)

Interdistrict transfer to District of Central District of California (efs) (Entered: 10/28/1991)
https://ecf.mad.uscourts.gov/cgi-binlIDktRpt.pl?7643 648849584341_280_0-1

8 **I** Motion by Aura Systems, Cypher Master, Inc., Innovative Inibrmat, Zvi Kurtzman for Matthew P.
Todd to appear pro hac vice (1mb) (Entered: 07/15/1991)

madei  Docket Report                                                                                    Pa

13 **I** Transcript from Hearing on 9/18/92 (1mb) (Entered: 01/24/1992)

Clerk transferred Transcript of Hearing dated 1/22/92 to the Central
District of California (1mb) (Entered: 01/24/1992)

## PACER Service Center

## Transaction Receipt

04/11/2005 14:50:25

| | | | |
|---|---|---|---|
| **PACER Login:** sw0232 | | **Client Code:** | |
| **Description: Docket** Report | **Search Criteria: 1:91-cv-10806-AAC** | | |
| **Billable Pages:** 2 | | **Cost:** | 0.16 |

https://ecf.mad.uscourts.gov/cgi-bin]DktRpt.pl?7643 648 84958434-L_280_0-1

Not Reported in Cal.Rptr.3d
2003 WL 22171909 (Cal.App. 2 Dist.)
Not **Officially Published**
**(Cal. Rules of Court, Rules 976,** 977)
**(Cite as: 2003 WL 22171909 (Cal.App. 2 Dist.))**


**Briefs and Other Related Documents**

Only the Westlaw citation is currently available.

California Rules of Court, rule 977(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 977(b). This opinion has not been certified for publication or ordered published for purposes of rule 977.


Court of Appeal, Second District, Division 7,
California.
Michael J. FRANKSTON, Plaintiff, Respondent
and Cross-Appellant,
v.
Patrick GLEN, et al., Defendants, Appellants and
Cross-Respondents.
No. B145777.
(Los Angeles County Super. **Ct.** No. **BC** 107852).

Sept. 22, 2003.

APPEALS from a judgment and order of the Superior Court of Los Angeles County. Alexander Williams, Judge. Judgment on the appeal is reversed and remanded; the cross-appeal is dismissed.

Greines, Martin, Stein & Richlin, Irving H. Greines and Marc J. Poster for Defendants, Appellants and Cross-Respondents.

Gambrell & Stolz and Joshua Tropper for Plaintiff; Respondent and Cross-Appellant.


WOODS, J.

**\*1 Patrick K. Glenn,** Neal Kaufman, Cipora Kurtzman, Hany Kurtzman and Arthur Schwartz ("Appellants") appeal: (1) the judgment upon the
jury's verdict in favor of Michael Frankston on his conversion, fraud and breach of fiduciary duty claims; (2) the court's order granting Frankston's motion for summary adjudication on Frankston's partnership accounting claim; and (3) the post-judgment order awarding Frankston attorney's fees. Appellants argue, among other things, they were entitled to judgment because Frankston's causes of action are all barred by the three or four year statute of limitations governing his claims. Although Frankston filed his complaint in June of 1994, Appellants assert Frankston was on inquiry notice of his conversion, fraud and fiduciary duty claims no later than the spring of 1989. With respect to the accounting claim, Appellants contend Frankston's partnership with Appellants dissolved in the spring of 1989 and thus the accounting claim is also untimely. For the reasons discussed herein, we agree and therefore, reverse and remand.

On the cross-appeal, Frankston challenges the post-judgment award of costs. He claims the trial court erred in failing to award the costs of the accounting (including the legal and accounting fees) as a proper part of the winding up of the partnership. In view of the reversal on the appeal, the cross-appeal is dismissed as moot.

### FACTUAL AND PROCEDURAL HISTORY
{FNI]

FN 1. Although the appeal and cross-appeal raise multiple issues and involve a complex factual history, only those facts directly relevant to the dispositive issue are described in detail.

**Background of the Partnership.** Frankston, a stock market investor and engineer met the Appellants in the early 1980s. Appellant Harry Kurtzman sold Frankston and the other Appellants approximately 100,000 shares each of restricted stock in a small, privately held defense industry firm, Innovative Information Systems (ITS), which Kurtzman

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://prinLwestlaw. com!de1ivery.htm1?dest~atp&format=HTMLE&dataid=B005 5800000...
3/28/2005

Not Reported in Cal.Rptr.3d
2003 WL 22171909 (Cal.App. 2 Dist.)
**Not Officially Published**
**(Cal. Rules of Court, Rules 976, 977)**
**(Cite as: 2003 WL 22171909 (Cal.App. 2 Dist.))**

controlled. Appellants and Frankston each spent approximately $6,000 for their shares of ITS stock.

In early 1987, Kurtzman told Frankston and the other Appellants about Anchor Growth (Anchor), a shell company that had no actual business, but had completed the required legal formalities to allow for public trading of its stock. Kurtzman planned a merger of ITS's parent company and Anchor. Prior to the merger, Anchor had approximately 800,000 "freely-traded" shares. Kurtzman proposed he, the other Appellants and Frankston obtain as much of the free-trading Anchor shares as possible so the people associated with ITS could control the new post-merger company and would gain a greater profit from any post-merger increase in the stock value.

Consequently, Appellants and Frankston formed a partnership to invest in the stock of Anchor. The purpose of the partnership was to buy the pre-merger Anchor stock, to resale it after the merger when its value increased and to lend the profits from the resale of the stock to the newly formed company (which they would control), with the understanding the new company would repay the partnership when the new company had the means to do so. The Anchor stock, however, could not be purchased in one lump sum. Therefore the individual partners bought small amounts of stock at different times and for different prices. Nonetheless, the partners agreed to divide equally the profits resulting from the partnership. Harry Kurtzman agreed to keep track of the partnership transactions.

*2 Frankston purchased 45,000 freely traded shares of Anchor stock for $19,066 while Appellants purchased over 655,000 shares (collectively "partnership stock"). Thereafter in 1987, the merger was completed and the new company, Aura Systems, Tnc. ("Aura") was formed. All of the pre-merger ITS and Anchor stock became Aura stock. The Appellants and Frankston assumed leadership positions in Aura. In addition to being an individual stockholder of Aura, Frankston served on Aura's board of directors.

As predicted the value of the partnership stock increased. Pursuant to their agreement in early 1988, Frankston and Appellants began selling their partnership stock and lending 65 to 75 percent of the profits to Aura. Frankston sold 30,000 shares (of the 45,000 he bought for the partnership) in April 1988 and lent Aura $25,000 of the proceeds. The Appellants collectively sold approximately 551,500 shares and lent a total of $471,583 to Aura.

*Aura Stock and Cash Distribution Promised to Frankston As His Share of the Partnership Profits.*

In the summer of 1988, Frankston learned Aura planned a $5 million private placement of four million new shares of Aura stock to a group of investors to raise money for the company. Kurtzman informed Frankston Aura would repay approximately $300,000 worth of partnership loans through the issuance of 240,000 shares of new restricted Aura stock in connection with the private placement, and thus, each partner would receive 40,000 shares of stock from this transaction (known hereafter as the "Partnership Debt Shares"). Frankston understood the issuance of the new stock would occur as a part of the private placement. Reducing Aura's debt in this manner allowed the company to retain funds and help attract outside investors. TI was also anticipated the private placement would generate sufficient funds to place Aura on solid financial footing and allow it to repay its debts. According to Frankston, the remaining monies owed the partnership by Aura were not necessarily connected to the private placement. He understood that additional (other than the Partnership Debt Shares) partnership distributions would be paid when Aura had the funds to repay the remaining loans.

In the fall of 1988, Frankston became dissatisfied with the Appellants and the manner in which they were running Aura. He was not informed of several Aura board meetings. Frankston concluded he could not rely upon or trust the Appellants, in particular, Harry Kurtzman, when it came to the matters of business. Frankston felt Kurtzman was more interested in inflating Aura's stock price than in developing the business and building new products. In an October 1988 letter to an Aura employee, Frankston described his partners as dishonest,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in Cal.Rptr.3d
2003 WL 22171909 (Cal.App. 2 Dist.)
**Not Officially Published**
**(Cal. Rules of Court, Rules 976, 977)**
**(Cite as: 2003 WL 22171909 (Cal.App. 2 Dist.))**

unreliable, incompetent, disingenuous and greedy. He indicated any further effort to assist Aura would amount to a waste of time. Frankston and Kurtzman also had several heated personal exchanges about the business; at one point Kurtzman told Frankston to leave the premises.

*3 At the end of October 1988, Frankston a resident of Massachusetts, made his last visit to Aura's Los Angeles headquarters. During his visit he packed up his office and met with Kurtzman and several other Appellants to come up with correct figures for how much Aura owed Frankston (on personal loans he made to the company), how much Frankston was owed by the partnership and how much Kurtzman and Frankston owed each other from other

personal dealings. To that end, on November 1, Kurtzman showed Frankston a handwritten document ("Exhibit 8" at trial) purporting to account for and summarize the various non-partnership and partnership transactions. Exhibit 8 showed, among other details, the amount of Anchor stock purchased by each partner on behalf of the partnership, sold and then lent to Aura. According to Exhibit 8, approximately 19,000 shares of partnership stock remained unsold as of November 1, 1988. Of that stock, Frankston held 15,000 [FN2] shares and the other 4,000 was held by appellant Schwartz. Exhibit 8 also showed the partners were to receive Partnership Debt Shares (i.e., the $300,000 worth of stock issued in the private placement and divided equally among the partners) and were also to receive a cash distribution of approximately $27,000 each. At the meeting, Frankston also received a check for approximately $28,990 as partial repayment for other loans he made to Aura. [FN3]

> FN2. By the November 1, 1988, meeting, Frankston had already begun selling off the 15,000 shares of partnership stock.

> FN3. According to Frankston, Aura owed him personally (as separate from the partnership) more than $78,000. Aura was to repay him through a combination of the $28,000 check and a promise of $50,000 worth of new Aura shares (approximately 40,000 shares) ("Personal Debt Shares").

In December 1988, Frankston continued to sell the remaining 15,000 shares of partnership stock. At no time did Frankston offer to loan the proceeds from the sale to Aura, nor did he seek to divide the proceeds with Appellants. According to Frankston he retained the monies from the sale while he waited for a final accounting; he intended to keep the monies as an offset against the amounts owed him by the partnership.

Also in December, Frankston had a telephone conversation with an Aura company lawyer in which they discussed the private placement and the Partnership Debt Shares. Frankston was informed the private placement would be done "soon." At that point Frankston was already expecting to receive his portion of the Partnership Debt Shares and thus, Frankston disclosed his ownership of the shares on his SEC schedule 13-D filing. In January 1989, Frankston resigned from Aura's board and "washed his hands" of the business side of the company.

### The Private Placement

In late 1989, Aura began issuing news releases to announce the completion of the private placement. After the private placement, Aura became listed for trading on NASDAQ. In February 1989, Aura sent to shareholders various documents filed with the SEC including the company's lOQ; Aura's 10K was sent thereafter by mid-1989. Those documents informed shareholders Aura had completed the private placement, had paid off outstanding debts, including loans from officers and directors of the corporation and had $2,034,003 of capital to conduct business. Frankston stated he did not read Aura's annual or quarterly statement because he was not interested in them and assumed they did not contain accurate information.

*4 Also in early 1989, Frankston began selling his non-partnership restricted Aura stock. To do so, he had to file a Rule 144 form with the SEC to have the stock restrictions lifted. These forms indicated Frankston had relied on Aura's SEC filings in applying to have the restrictions removed. [FN4J

> FN4. At trial Frankston explained that not withstanding the statements on the Rule

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in Cal.Rptr.3d
2003 WL 22171909 (Cal.App. 2 Dist.)
**Not Officially Published**
**(Cal. Rules of Court, Rules 976, 977)**
**(Cite as: 2003 WL 22171909 (Cal.App. 2 Dist.))**

Page 4

144 form, he did not actually review or rely on Aura's SEC's filings because he expected his stockbroker to have reviewed the materials.

Tn March 1989, Frankston sent Aura and several Appellants four letters in which he requested money and stock owed him by Aura and various Appellants. According to Frankston, these letters concerned non-partnership matters (i.e., did not concern the Partnership Debt Shares or any cash distribution) and instead one pertained to personal loans made to Aura by Frankston while others concerned stock of another company. Frankston received no response to his letters.

Aura's SEC S-i form filed in April of 1989 indicated Appellants each received 48,000 shares of Aura restricted stock from the private placement. Though this document was publicly filed, Frankston was not among the shareholders sent the document.

Frankston never received his Partnership Debt Shares nor did he receive any cash distributions from the partnership.

*Litigation*

In March 1991, Frankston sued Aura, Kurtzman and others in federal district court seeking to recover damages for Aura's failure to give him the promised Personal Debt Shares. The jury in the federal case awarded Frankston $61,000 in damages. [FN5]

> FN5. Appellants have always asserted the Personal Debt Shares and the Partnership Debt Shares are one in the same. Thus, Appellants have argued the principles of res judicata apply and preclude Frankston from recovering damages in this action for the injury for which he received a damage award in the federal action.

In March 1994, Frankston sued Appellant Glenn and another company based on an alleged unauthorized transfer of Aura shares which Frankston had instructed Glenn to hold. [FN6]

> FN6. This action was not yet final at the time the instant case came to trial.

Frankston filed the instant action in late June 1994. In essence he alleged Appellants had taken his Partnership Debt Shares and had failed to pay him his cash share of the partnership distributions. He asserted causes of action for conversion, fraud, breach of fiduciary duty and requested a partnership accounting.

Appellants filed a motion for summary judgment, arguing among various contentions that Frankston's conversion, fraud and breach of fiduciary duty claims (hereinafter the "Tort Actions") were barred by the relevant three and four year statutes of limitation. Appellants argued Frankston was on inquiry notice of all of his claims by mid-1989. They also argued the accounting claim was untimely because partnership dissolved no later than 1989.

Frankston claimed he did not discover Appellants' misconduct until September of 1992 (within the statute of limitations period) when Frankston reviewed internal Aura documents which he received in connection with the other litigation. [FN7] Frankston also filed a motion for summary adjudication on the accounting claim. The trial court denied Appellants' motion and granted Frankston's motion.

> FN7. These documents apparently showed that in late 1988 Appellants had divided
> Frankston's    40,000    Partnership    Debt
> Shares and his portion of the partnership cash distribution amongst themselves.

Frankston's Tort Actions went to a jury trial. In a special verdict the jury concluded Appellants had converted

partnership monies owed to Frankston and the Partnership Debt Shares, had committed fraud and breached their fiduciary duties to him. Specifically with respect to the statute of limitations, the jury adopted Frankston's view that he did not have constructive notice of his claims with respect to the Partnership Debt Shares until September 1992 and did not have constructive notice of his claims for partnership cash

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http ://print.west1aw.com1de1ivery.htm1?dest=atp&format=HTMLE&dataid=~B005 5800000...
3/28/2005

Not Reported in Cal.Rptr.3d
2003 WL 22171909 (Cal.App. 2 Dist.)
Not Officially Published
**(Cal. Rules of Court, Rules 976, 977)**
**(Cite as: 2003 WL 22171909 (Cal.App. 2 Dist.))**

distributions until June 1993. The july awarded Frankston compensatory and punitive damages.

*5 Thereafter the court memorialized its decision on the accounting. Specifically the court found, Frankston did not have constructive notice that he was not going to receive a further partnership accounting (other than Exhibit 8) until September 1992 and that the partnership was not dissolved until Frankston filed the instant complaint in June 1994.

The court entered judgment for Frankston against the Appellants jointly and severally for $646,084 compensatory damages, prejudgment interest of $575,053.50 and $88,193.55 in costs. The court also entered judgment against the individual Appellants for compensatory and punitive damages.

Appellants filed a motion for judgment notwithstanding the verdict and a new trial. In the J7NOV, Appellants argued, inter alia, Frankston's claims were barred by the statute of limitations.

The court denied the motions. Thereafter the court granted Frankston's motion for attorney's fees based on Appellants' denial of certain requests for admission. The court, however, denied Frankston's request to recover the costs (including attorney and accounting fees) of the accounting.

Appellants timely appealed the judgment and the post-judgment award of fees. Frankston timely filed a cross-appeal of the post-judgment order denying him the costs of the accounting. [FN8]

> FN8. This court consolidated the appeals.

### DISCUSSION

The jury found Frankston did not have constructive notice of his Tort Actions (i.e., conversion, fraud and breach of fiduciary duty) with respect to the Partnership Debt Shares until September 1992 and did not have constructive notice of his claims for partnership cash distributions until June 1993. In granting Frankston's motion for summary adjudication and denying Appellants' summary judgment motion on the accounting claim the court concluded the partnership was not dissolved until

Frankston filed the complaint in June 1994. [FN9J We consider these matters in turn. [FN 10]

FN9. The court memorialized this finding in its statement of decision on the accounting.

FN 10. On appeal, Appellants assert other contentions in addition to their statute of limitations argument. Specifically, they claim the judgment should be reversed because: (1) Frankston cannot recover for conversion of intangible stocks and fungible money; (2) Frankston did not present sufficient evidence of damages resulting from fraud or a breach of fiduciary duty; (3) the jury and the court miscalculated the value of the Aura stock at issue and in awarding prejudgment interest; (4) the court made several errors in the accounting by requiring the Appellants to account for more Aura shares than the partnership owned; (5) Appellants were entitled to have a jury decide whether Frankston was seeking to recover for the same shares which were the subject of his federal action; and (6) insufficient evidence supported the post judgment order awarding attorney fees. Our conclusion his claims are barred by the statute of limitations entirely disposes of the appeal, and therefore, we do not reach the merits of the other issues Appellants raised.

**A.** *Tort Actions*

The substantial evidence standard of review governs our consideration of the jury's finding on the statutes of limitations governing the Tort Actions.

***Standard of Review.*** in reviewing for sufficiency of the evidence, we give all reasonable inferences in favor of the prevailing party and review the record in the light most favorable to the judgment. ( *Cochran v. Rubens* (1996) 42 Cal.App.4th 481, 486 ] Nonetheless, the substantial evidence standard of review is not "merely an appellate incantation

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in Cal.Rptr.3d
2003 WL 22171909 (Cal.App. 2 Dist.)
**Not Officially Published**
**(Cal. Rules of Court, Rules 976, 977)**
**(Cite as: 2003 WL 22171909 (Cal.App. 2 Dist.))**

designed to conjure up an affirmance."
*Roddenberry     v. Roddenberry*    **(1996)**    44
Cal.App.4th 634, 652.) Substantial evidence is evidence of ponderable legal significance--that is reasonable, credible and of solid value. It does not mean any evidence. A decision supported by a mere scintilla of evidence is not sufficient. Thus, focus is on the quality rather than the quantity of the evidence. *(Id.* at p. 651.) Inferences may amount to substantial evidence, but the inferences must be based on logic and reason. A reasonable inference may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work. A finding of fact must be an inference drawn from evidence rather than a mere speculation as to probabilities without

evidence. *(Ibid.)*

*6 Moreover, our review requires us to consider the entire record. "The ultimate test is whether it is reasonable for a trier of fact to make the ruling in question in light of the whole record." *(Id.* at p. 652.) Reviewing the entire record allows the appellate court to discern whether the trier of fact reasonably believed some evidence while rejecting other evidence. *(Ibid.)* With these principles in mind, we turn our attention to the merits.

***Tort Actions Statute of Limitations.*** On appeal Appellants argue Frankston's Tort Actions are barred by three and four years statute of limitations governing the claims. As set forth below, we agree.

Frankston's causes of action for fraud and conversion are governed by the three-year statute of limitations in Code of Civil Procedure section 338. [FN11] (~ 338; *Parsons v. Tickner* (1995) 31 Cal.App.4th 1513, 1524- 1525.) Frankston's breach of fiduciary duty claim is governed by the four-year catch-all statute of limitations in section 343.

> FN 11. Statutory references are to the Code of Civil Procedure unless otherwise indicated.

Generally a cause of action accrues when the wrongful act is done and not at the time the plaintiff discovers it. However under the delayed discovery rules, a cause of action will not accrue until the
plaintiff discovers or should have discovered, through the exercise of reasonable diligence, all facts essential to the cause of action. *(Prudential Home Mortgage Company, Inc. v. Superior Court (Diaz)* (1998) 66 Cal.App.4th 1236, 1246.) In other words, the statute of limitation runs when the plaintiff suspects or should suspect something is wrong. - 'Under this rule constructive and presumed notice are equivalent to knowledge. So, when the plaintiff has notice or information of circumstances to put a reasonable person on inquiry, or has the opportunity to obtain knowledge from sources open to his or her investigation (such as public records or corporation books), the statute commences to run.' *(Parsons v. Tickner, sup ra,* 31 Cal.App.4th at p. 1525.) "A plaintiff need not be aware of the *specific facts'* necessary to establish the claim; that is a process contemplated by pretrial discovery. Once the plaintiff has a suspicion of wrongdoing, and therefore an incentive to sue, she must decide whether to file suit or sit on her rights. So long as a suspicion exists, it is clear that the plaintiff must go find the facts; she cannot wait for the facts to find her." *(Jolly v. Eli Lilly and Company* (1988) 44 Cal.3d 1103, 1111; italics added.)

The delayed discovery rule is applied to actions involving fiduciary relationships. Where a fiduciary obligation exists, however, facts which would ordinarily require investigation may not incite suspicion and do not give rise to the *usual* duty of inquiry; the duty to investigate *may* arise later because the plaintiff is entitled to rely upon the assumption his or her fiduciary is acting on his or her behalf. *(Eisenbaum v. Western Energy Resources, Inc.* (1990) 218 Cal.App.3d 314, 324-325.) In any event, once the plaintiff becomes aware of facts, which would make a reasonably prudent person suspicious, the duty to investigate nonetheless arises and the plaintiff may then be charged with the knowledge of facts which would have been discovered by such an investigation. ( *Hobbs v. Bateman Eichler, Hill Richards, Inc.* (1985) 164 Cal.App.3d 174, 202.)

*7 Finally, the delayed discovery rules are an exception to the general rule governing the accrual of claims. Consequently, the plaintiff shoulders the burden to establish facts showing he or she was not

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in Cal.Rptr.3d
2003 WL 22171909 (Cal.App. 2 Dist.)
**Not Officially Published**
**(Cal. Rules of Court, Rules 976, 977)**
**(Cite as: 2003 WL 22171909 (Cal.App. 2 Dist.))**

Page 7

negligent in failing to make the discovery sooner and he or she had no actual or presumptive knowledge of the facts sufficient to put a reasonable person on inquiry. *(Sun N Sand, Inc.* v'. *United Bank of Cal~fornia* (1978) 21 Cal.3d 671, 701-702.)

The evidence presented at trial demonstrated Appellants failed to give Frankston his Partnership Debt Shares and cash distribution, and in fact, divided those assets amongst themselves in the fall of 1988. Thus, here, the inquiry turns on the issue of when Frankston discovered or should have discovered Appellants' misconduct.

Frankston filed his action in June of 1994. Accordingly, at trial Frankston needed to show he was not negligent in failing to discover Appellants' conduct and had no actual or presumption knowledge prior to June of 1991 on the fraud and conversion claims and prior to June of 1990 with respect to the breach of fiduciary duty claim. Frankston testified he first learned of the misconduct in September of 1992 when he reviewed internal Aura documents he received in connection with other litigation. In reaching its verdicts the jury adopted Frankston's view he did not have notice of his claims with respect to the Partnership Debt Shares until September 1992 and did not have notice of his claims for partnership cash distributions until June 1993.

In our view the jury's conclusion cannot stand. In reaching its conclusion, the jury rejected uncontroverted evidence susceptible to only one legitimate inference showing Frankston had constructive notice of his claims not later the spring of 1989.

At trial Frankston testified he knew he would receive his Partnership Debt Shares in connection with the private placement. In late 1988, Frankston was expecting his shares because he was told that the private placement would happen soon. He even disclosed he owned them in his SEC 13D filing. The private placement occurred in late 1988. Aura's quarterly report filed with the SEC and sent to shareholders in February 1989, disclosed the private placement had occurred and Aura was solvent. Aura's annual report sent to shareholders in mid-1989 also disclosed the private placement and further noted Aura had repaid nearly all of its debts and possessed significant operating funds. Nonetheless, neither Frankston's Private Placement Shares or any partnership cash distribution were paid to him.

Frankston testified he did not read Aura's 10K and lOQ documents [FN12] because he was not interested in them and based on his prior experiences with Aura he expected them to be untrustworthy.

> FN12. Neither below nor on appeal does Frankston claim he *did not* receive Aura's 10K and 1OQ reports. In contrast, he did present evidence he did not receive Aura's S-l statement filed in April 1989, which indicated Appellants each received 48,000 shares of Aura restricted stock from the private placement.

In our view a reasonably prudent Aura shareholder would have read the company's annual and quarterly reports. Frankston is charged with the knowledge of facts which would have been discovered had he read them. (See *Turner v. Lundquist* (1967) 377 F.2d 44, 47-48 [investor charged with notice of information contained in company's annual statement and financial statements for the purposes of the statute of limitation].) Moreover, the information contained in the reports about the private placement would have caused a reasonable prudent person to make additional inquiries and investigation about the Partnership Debt Shares and any other payments Aura made on the loans owed the partnership.

*8 Thus, Frankston's failure to obtain actual notice of Appellants' conduct earlier than 1992 and Frankston's delay in filing suit until 1994 is attributable to Frankston's own negligence, that is, to his failure to review information in company SEC documents readily available to him. (See *Bernson v. Browning-Ferris Industries oJ California, Inc.* (1994) 7 Cal.4th 926, 936 ["a plaintiff may not disregard reasonably available avenues of inquiry which, if vigorously pursued, might yield the desired information"].)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in Cal.Rptr.3d
2003 WL 22171909 (Cal.App. 2 Dist.)
**Not Officially Published**
**(Cal. Rules of Court, Rules 976, 977)**
**(Cite as: 2003 WL 22171909 (Cal.App. 2 Dist.))**

Had Frankston read these documents, he would have discovered by mid-1989 Aura was claiming the private placement had already occurred--the very event he expected would trigger the issuance of his Partnership Debt Shares. Given that Frankston was expecting but had not yet received his Partnership Debt Shares in early 1989, his discovery from the company reports that the private placement had occurred in late 1988 would have raised suspicions that something was amiss. Reasonable inquiries following such discovery would have unearthed information, such as the publicly filed Aura 5-1 document in which Appellants disclosed they had each received 48,000 shares from the private placement and thus, in essence had divided Frankston's partnership shares amongst themselves.

The party seeking to invoke the delayed discovery rules must show that he or she acted with diligence in protecting his or her rights, i.e., she has not made herself willfully ignorant. Frankston simply could not make such a showing.

Finally, that Appellants owed Frankston a fiduciary obligation does not change the result. The fiduciary relationship allowed Frankston to assume Appellants were acting on his behalf *until* he had knowledge to the contrary. A review of Aura's annual and quarterly reports and the subsequent inquiries such review would generate would have apprised Frankston Appellants were not acting in his best interest.

In light of the entire record no reasonable trier of fact could have concluded otherwise. To do so would be to isolate and credit only evidence relevant to actual knowledge (in June 1992) while arbitrarily rejecting unrefuted evidence showing constructive notice (by mid-1989).

Consequently, this is that rare case where the jury's verdict is not supported by sufficient evidence. The evidence presented at trial leads to but one legitimate and reasonable conclusion, Frankston had constructive notice of his Tort Actions in the spring of 1989 and thus his June 1994 complaint is untimely. Consequently, the trial court erred in denying Appellants' motion for a judgment not
withstanding the verdict on the Tort Actions.

**B.** *Accounting Claim*

Appellants filed a motion for summary judgment arguing Frankston's partnership accounting claim was barred by the statute of limitations. Frankston opposed the motion, and in fact, filed a motion for summary adjudication of the claim, asserting the cause of action for an accounting was timely because it did not accrue until Frankston filed his lawsuit in June 1994, and thereby effectively dissolved the partnership. In denying Appellants' motion and granting

Frankston's motion, the trial court concluded the accounting claim was timely filed. [FN13]

> FN13. Frankston asserts Appellants cannot raise the issue of the timeliness of the accounting claim in this court because Appellants did not appeal the order granting the summary adjudication. However, the order granting the summary adjudication motion was not immediately appealable when entered because it did not dispose of all remaining causes of action. An order granting summary adjudication is properly reviewed after the entry of a final judgment. *(Anmaco v. Bob/ken* (1993) 13 Cal.App.4th 891, 897.) In addition, the fact Appellants failed to list the order in their notice of appeal does not preclude our review of the matter. A prior nonappealable order need not be specified in the notice of appeal from a subsequent appealable judgment. (See § 906; *County of Los Angeles v. City of' Los* Angeles (1999) 76 Cal.App.4th 1025, 1028). Thus, we conclude this issue is properly before us.

**\*9** *Standard of Review.* Both the granting of summary adjudication judgment motion and the denial of the summary judgment motion are governed by the *de nova* standard of review. This court independently reviews whether there is a genuine issue of material fact and whether the moving party is entitled to judgment as a matter of law. ($\sim$ 437c, subd. (c); *Union Bank v. Superior*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in Cal.Rptr.3d
2003 WL 22171909 (Cal.App. 2 Dist.)
**Not Officially Published**
**(Cal. Rules of Court, Rules 976, 977)**
**(Cite as: 2003 WL 22171909 (Cal.App. 2 Dist.))**

*Court.* (1995) 31 Cal.App.4th 573, 579.) This court applies the same standards as did the trial court. Review of the trial court's determination requires reassessment of the legal significance of the documents upon which the trial court acted. *(Hulett*
*v. Farmers Insurance Exchange* (1992) 10 Cal.App.4th 1051, 1058.)

In conducting our review, we are limited to the facts shown by the evidentiary materials (i.e., declarations and deposition testimony) submitted, as well as those facts admitted or uncontested in the pleadings, and moving and opposing papers. *(Sacks v. FSR Brokerage, Inc.* (1992) 7 Cal.App.4th 950, 962.) The evidence presented by the moving party is strictly construed and that of the opposing party is liberally construed; the facts alleged in the evidence of the opposing party and the reasonable inferences therefrom must be accepted as true. *(Savage v. Pacflc Gas and Electric Co.* (1993) 21 Cal.App.4th 434, 440.)

We affirm an order granting summary adjudication where the papers and pleadings show there is no triable issue of material fact in the action, (i.e., where the evidence demonstrates the claims of the opposing party are entirely without merit on any legal theory) thereby entitling the moving party to judgment as a matter of law. ($\sim$ 437c, subd. (c); see *Mann v. Cracchiolo* (1985) 38 Cal.3d 18, 35-36.) These principles are informative of our consideration of the issues relating to the accounting claim.

***Accounting Claim Statute of Limitations.*** The four-year catchall statute of limitations in section 343 governs a claim seeking an accounting from a partnership. *(Manok v. Fishman* (1973) 31 Cal.App.3d 208, 213; *Peebles v. R.G. Garland Corp.* (1972) 27 Cal.App.3d 163, 166.)

Under the former [FN14] Corporation Code section 15043, the right to an accounting accrues to **a partner against** his or her other partners at the date of dissolution of the partnership absent an agreement to the contrary. [FNI5] Former

Corporations    Code    section    15029    defined

dissolution as "the change in the relation of the partners caused by any partner ceasing to be

associated in the carrying on as distinguished from winding up of the business." Pursuant to former Corporations Code section 1503 1, a partnership is dissolved by various means including the termination of the particular undertaking of the partnership agreement. In other words, a partnership ends, a cause of action for a partnership accounting accrues and the statute of limitations begins to run when the business of the partnership is substantially complete or where the purpose of the partnership is accomplished. (See *Wrightson v. Dougherty* (1936) *5* Cal.2d 257, 261; *San Francisco Iron and Metal Company v. American Milling & Industrial Company* (1931) 115 Cal.App. 238, 248.) Moreover, "an abandonment or dissolution of a partnership ⌐ may take place by conduct inconsistent with its continuance, in spite of the fact that liquidation is not complete, or that some appearances of partnership continue." *(Middleton v. F.P. Newport* (1936) 6 Cal.2d 57, 62.)

> FNI4. At the time this partnership was formed in 1987, California partnerships were governed by the Uniform Partnership Act (UPA). In 1996, the Legislature enacted the "Uniform Partnership Act of 1994" which was made to apply to all partnerships entered into after January 1, 1997. This partnership formed prior to that date continues to be governed by the original UPA. Consequently, all references to the Corporations Code herein refer to the former, pre-1997 code or the original UPA.

FN15. There is no made any agreement **an accounting.**

evidence the partners on a date to complete

*10 In our view uncontroverted evidence presented below in connection with the motion for summary judgment and motion for summary adjudication leads to but one logical conclusion, that is, Frankston~s partnership with Appellants dissolved no later than spring 1989 when the business of the partnership was substantially complete and its purpose accomplished.

Appellants and Frankston formed a partnership to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://print.westlaw.comldelivery.html?dest=atp&format=HTMLE&dataid=Booss 800000...
3/28/2005

Not Reported in Cal.Rptr.3d
2003 WL 22171909 (Cal.App. 2 Dist.)
**Not Officially Published**
**(Cal. Rules of Court, Rules 976, 977)**
**(Cite as: 2003 WL 22171909 (Cal.App. 2 Dist.))**

invest in the stock of Anchor. The purpose of the partnership was to buy the pre-merger Anchor stock, to resale it after the merger when its value increased and to lend the profits from the resale of the stock to Aura with the understanding Aura would repay the partnership when Aura had the means. All of the transactions and events relating to the partnership's business occurred between 1987 and early 1989.

Frankston and Appellants began purchasing pre-merger Anchor freely traded stock in 1987. Also in 1987 Aura was created from the merger of Anchor and 115's parent company. In 1988, Frankston and Appellants sold almost all of the partnership stock and lent the proceeds to Aura. In late 1988, Aura completed the private placement and began to repay partnership and other debts.

In late 1988, only 19,000 shares of partnership stock were still held by the partners. Of that, Frankston held 15,000 shares, which he sold between late 1988 and early 1989. At no time did Frankston offer to loan the proceeds from that stock sale to Aura, nor did he seek to divide the proceeds with Appellants. According to Frankston he retained the monies from the sale while he waited for a final accounting; he intended to retain the monies as an offset against the amounts owed him by the partnership. Frankston's conduct with respect to the 15,000 shares is inconsistent with the continuance of the partnership, and instead is consistent with the view the partnership had completed its undertaking and all that remained was the winding up of partnership affairs.

There was simply no evidence the partnership conducted any business (i.e., bought any additional shares or lent any funds to Aura) after early 1989. The fact the partnership still owned 4,000 partnership shares in early 1989 does not, standing alone, prolong the life of the partnership. These assets notwithstanding, by the spring of 1989 the partnership's purpose was accomplished as there was no evidence Aura needed or sought any new loans from the partnership at that point.

In view of the foregoing, we cannot agree with the lower court's finding the partnership existed until Frankston filed this lawsuit in June of 1994. Instead, we conclude the uncontroverted evidence demonstrates the partnership dissolved no later than spring of 1989 and the four-year statute of limitation for the accounting claim ran no later than the spring of 1993. Consequently, the trial court erred in granting summary adjudication on Frankston's accounting claim and erred in failing to grant Appellants' judgment on the claim.

### DISPOSITION

**\*11** The judgment is reversed and remanded with directions to the trial court to (1) grant Appellants' motion for judgment notwithstanding the verdict; (2) deny respondents' motion for summary adjudication on the accounting claim and grant Appellants' motion for summary adjudication on the accounting claim; and (3) to enter an order denying respondent's post-judgment motion for fees and costs. The cross-appeal is dismissed as moot. Appellants are entitled to costs on appeal.

I concur: MUNOZ (AURELIO), J. [FNi

> FN* Judge of the Los Angeles Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

JOHNSON, J., Dissenting.

I concur with respect to the disposition of the tort causes of action. I respectfully if briefly dissent, however, from the reversal of the trial court's decision denying appellants' summary judgment motion in which the judge rejected their claim the statute of limitations had run on respondent's accounting action. Admittedly, one might reasonably quarrel with the judge's further decision granting respondent summary adjudication on the same issue-- finding there was no triable issue but that the limitations period had *not* expired. Yet in my view that is a much closer call than the position the majority opinion accepts--this court's holding there is no triable issue but that the limitations period *had* expired. At a minimum, there is a triable issue whether the statute of limitations indeed had run. As a result, at a minimum, I would remand for **a** full scale trial on that question.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://print.west1aw.co~de1ive~.htm1?destatp&fon~at~HTMLE&dataidB005 5800000...
3/28/2005

Not Reported in Cal.Rptr.3d
Page 11
2003 WL 22171909 (Cal.App. 2 Dist.)
**Not Officially Published**
**(Cal. Rules of Court, Rules 976, 977)**
**(Cite as: 2003 WL 22171909 (Cal.App. 2 Dist.))**

My differences with the majority opinion are not about the applicable law, but with its appraisal of the facts. To begin explaining why summary judgment is inappropriate, recall appellants bear the burden of proof on the statute of limitations issue. In order to earn a summary judgment, they must demonstrate conclusively the statute began running before June 29, 1990. They cannot succeed by withholding testimonial or documentary evidence which might contradict their position and then claim respondent has failed to prove the limitations period commenced later than that date. It is their burden and, especially at the summary judgment stage, a heavy one. And, on appeal of a trial court's denial of summary judgment, it is an even heavier burden. That court's evaluation of appellants' evidence and its conclusion respondent failed to prove conclusively the limitations period had expired before respondent filed his complaint is entitled to great deference. [FN 1]

> FN1. On the other hand, no such deference is owed to that same judge's decision on respondent's summary adjudication motion. Instead in considering that motion we must ask whether, construing the evidence and inferences in appellants' favor, there remains a triable issue the limitations period indeed had expired before respondent filed his accounting action. In my view, neither party submitted evidence in support of their cross-motions sufficiently conclusive to avoid a finding the issue remains "triable."

The majority opinion adopts appellants' position the partnership had terminated more than four years before respondent filed his action because the partnership had a "particular undertaking" and that "undertaking" had been completed. The burden of proof once again falls heavily on respondents. "A partnership once shown to exist is presumed to continue until the contrary is shown, and the burden of proof is upon him who asserts its termination.' [FN2J

> FN2. See, e.g., *Asamen v. Thompson* (1942) 55 Cal.App.2d 661, 668- 669.

Here, at a minimum, a triable issue remains exactly what constituted this partnership's "particular undertaking (or undertakings)" and whether the partnership had completed that "particular undertaking" or those "particular undertakings" by June 1990.

**\*12 To** begin with, it is important to note the partnership formed to take over the shell publicly-traded corporation and merge it with the partners' privately held but operational company was a distinct business entity not absorbed into the merged corporation. Thus, Frankston's resignation from the board of the latter had nothing to do with the continuance of the partnership.

The partnership itself contemplated several "undertakings" beyond the initial purchases of stock in the publicly-traded shell corporation, at least some of which had not been completed as of June 1990--and probably not as of June 1994. From the beginning, those "undertakings" included not only a pooling and eventual distribution of the stock acquired, but the sale of appreciated stock to defray the "cost" of making those initial purchases. Beyond that, later events evidenced the partnership continued and added further "undertakings" including personal loans to the company as well as use of the partnership stock to support the ongoing operations of the new corporation--and especially to rescue it if and when it fell into financial jeopardy. The first time this occurred was in the Spring of

1988 when, at Kurtzman's request, partners including Frankston began selling partnership shares and loaning most of the proceeds to the company with the understanding they would be repaid at a later time. Still later on, the partners agreed to accept additional restricted shares as repayment of the partnership loans they had made to shore up the company.

There is a triable issue, at a minimum, whether all of these "undertakings" had been completed as of June 1992--or have as yet. Appellants have failed to produce evidence all the partnership shares have been sold, the loans repaid, and all distributions made. On the other hand, there is substantial evidence distributions were *not* made to at least one of the partners--respondent Frankston--which itself

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http ://print.west1aw.con~de1ive~.htmI?destatp&formahHTMLE&dataidB005 5800000...
3/28/2005

Not Reported in Cal.Rptr.3d
Page 12
2003 WL 22171909 (Cal.App. 2 Dist.)
**Not Officially Published**
**(Cal. Rules of Court, Rules 976, 977)**
**(Cite as: 2003 WL 22171909 (Cal.App. 2 Dist.))**

was part of the partnership's "undertakings Nor is there conclusive evidence the partnership did not remain on call to buttress the company if and when it ran into choppy financial waters--through personal loans, partnership loans, the issuance of new stock or whatever--well into the 1990's. In other words, it is far from clear this partnership had the limited "particular undertaking" the majority opinion describes and finds was fulfilled in the late 1980s.

For this reason, I would remand the accounting action to the trial court for a full trial of the statute of limitations issue. [FN3]

FN3. In my view, Frankston also should prevail on his cross-appeal were this court to have affirmed his accounting action. It would be appropriate for this court to reverse the trial court's refusal to allocate the fees and costs of the accounting action among all the partners. The trial court required Frankston to bear all those costs despite the fact the accounting was a partnership function and is considered a benefit to the entire partnership, including those partners who are accused and proven to have violated the partnership agreement. Indeed this division recently decided this very issue in the closely analogous context of a close corporation. *(Cziraki v. Thundercats, Inc.* (Aug. 20, 2003, B159413) _ Cal.App.4th _ 2003 Cal.App.Lexis 1286.) In that case, one of only three shareholders won a derivative action accusing the other two shareholders of actions detrimental to the corporation. We reversed the trial court's denial of the successful shareholder's motion requesting the corporation reimburse his litigation fees and costs. We ruled it was irrelevant there were no "passive" shareholders or that the two shareholders who were sued had interests adverse to the successful shareholder or that the plaintiff had also filed and lost individual claims against the other shareholders in the same lawsuit.

Officially Published, (Cal. Rules of Court, Rules 976, 977)

**Briefs and Other Related Documents (Back to top)**

2003 WL 23933013 (Appellate Petition, Motion and Filing) Respondent-Cross-Appellant's Petition for Rehearing (Oct. 07, 2003)Original Image of this Document (PDF)

2003 WL 22382775 (Appellate Brief) Cross-Appellant's Reply Brief (Feb. 13, 2003)Original Image of this Document (PDF)

2002 WL 32181647 (Appellate Brief) Combined Appellants' Reply and Cross-Respondents' Brief (Nov. 07, 2002)Original Image of this Document (PDF)

2002 WL 32181646 (Appellate Plaintiff-respondent-cross-Appellant's Brief (Aug. 22, 2002)Original Image Document (PDF)

Brief)
Opening of this

2002 WL 32181645 (Appellate Brief) Appellants' Opening Brief (Feb. 22, 2002)Original Image of this Document (PDF)

**B** 145777 (Docket)
(Nov. 02, 2000)
END OF DOCUMENT

2003 WL 22171909 (Cal.App. 2 Dist.) Not

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.